**Ernesto Camilo TAGLE and Triple R Trucking, Inc., Appellants,**

v.

**Ricardo GALVAN, Appellee.**

No. 04–03–00673–CV.

Court of Appeals of Texas, San Antonio.

Dec. 1, 2004.

Paul A. Bezney, Tracy L. Stoker, Dodge, Anderson, Jones, Bezney & Gillman, P.C., Dallas, G. Allen Ramirez, Ramirez & Garza, L.L.P., Rio Grande City, for appellants.

Timothy Patton, Timothy Patton, P.C., San Antonio, Michael M. De Shetler, De Shetler Law Firm, Corpus Christi, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, SARAH B. DUNCAN, Justice, concurring in the judgment, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by ALMA L. LÓPEZ, Chief Justice.

Ernesto Camilo Tagle and Triple R Trucking, Inc. appeal the trial court's judgment awarding Ricardo Galvan the sum of $2,000,000.00 for damages sustained in a motor vehicle accident. The damages were awarded after a bench trial in which Tagle and Triple R judicially admitted legal liability. Tagle and Triple R present five issues on appeal, contending: (1) the trial court erred in making a broad-form damage finding and in failing to enter additional findings as to each separate damage element; (2) the trial court erred in allowing one of Galvan's treating physicians to testify regarding future medical expenses; (3) the evidence is legally and factually insufficient to support the amount of damages awarded; (4) the trial court erred in not suggesting a remittitur; and (5) the trial court erred in calculating and awarding pre-judgment interest. We affirm the trial court's judgment.

### BACKGROUND

On January 11, 2000, Galvan was injured in an automobile accident. Tagle was driving an 18-wheel truck in the course of his employment with Triple R. Tagle admitted that he pressed the accelerator when he intended to press the brake. After the accident, Galvan was temporarily unconscious. When he regained consciousness, Galvan realized his car was on fire. Galvan struggled to open his door. When Galvan was able to open his door, he was unable to walk away from the car because of his injuries. Tagle assisted Galvan away from the car.

Galvan was taken by ambulance to the hospital where various x-rays were taken revealing that his ankle was broken. No x-ray was taken of Galvan's lower back. The hospital gave Galvan pain medication and released him with instructions to follow-up with his family doctor. Galvan was taken to Triple R's company doctor, who reported that Galvan had not sustained any serious injury and released Galvan to return to work with modified duty.

The record is unclear when Galvan had his initial visit with Dr. Mario Jiminez or Dr. Porfirio Rodriguez, who both work with the Family Health Center. These doctors appear to be Galvan's family doctors. The record contains a notation regarding an office visit on February 7, 2000, which is signed by Dr. Rodriguez. The plan contained in the notation states, "Continue with therapy. RTC in 1 week. Tentatively he may be able to return to [work] next week depending on progress we see in the arm."

Two days after the accident, Galvan began physical therapy treatment with Dr. Louis Patino. Dr. Patino's assessments vary from "slight improvement" to "no change" to "slight worsening." In March of 2000, Dr. Patino recommended an MRI. The radiologist, Dr. Kenneth Legendre, diagnosed Galvan's MRI as showing a disc herniation between the L4 and L5 spinal region. Dr. Patino referred Galvan to Dr. Jorge Tijmes, an orthopedic surgeon.

Dr. Tijmes examined Galvan on June 13, 2000. Dr. Tijmes noted Dr. Legendre's report and diagnosed Galvan as having neck pain, low back pain, and right leg radiculopathy. Dr. Tijmes reported that Galvan was a surgical candidate for lumbar laminectomy with fusion. Galvan was to continue his medications and to return in two weeks. Dr. Tijmes continued to follow Galvan's progression through his physical therapy.

Contrary to Dr. Tijmes's instructions, Galvan discontinued his physical therapy in August of 2000. Galvan testified at trial that he had economic and transportation difficulties.

In September of 2000, Dr. Tijmes released Galvan to modified duty; however, Dr. Tijmes stated that Galvan remained a candidate for a lumbar laminectomy and fusion of L4–L5. In October of 2000, Dr. Tijmes sent Galvan's attorney a letter of medical necessity, stating that Galvan was in need of lumbar surgery. Prior to the surgery, Galvan obtained a second opinion from Dr. Ernest Roman, who did not contradict Dr. Tijmes's assessment. The surgical procedure was performed in December of 2000.

In February of 2001, Galvan was referred back to Dr. Patino for physical therapy. Dr. Tijmes released Galvan for light duty in April of 2001.

Galvan sued Tagle and Triple R for damages resulting from the accident. The case was initially tried to a jury; however, a mistrial was declared. The case was subsequently tried to the bench, and a judgment was entered awarding Galvan $2,000,000.00 in actual damages, and $507,399.30 in prejudgment interest.

## BROAD–FORM DAMAGE FINDING

In their first issue, Tagle and Triple R contend the trial court erred in making a broad-form finding of $2,000,000 in actual damages, and in failing to make additional findings of fact which would have separated each element of Galvan's damages. Tagle and Triple R assert that the trial court's errors prevented them from adequately presenting their appeal. Tagle and Triple R liken the broad-form submission in this case to the improper submission of a single broad-form damage issue to a jury when one of the damage elements

the jury is instructed to consider is not supported by evidence. Tagle and Triple R cite *Harris County v. Smith*, 96 S.W.3d 230, 233–34 (Tex.2002), in support of their position.

In *Harris County v. Smith*, the issue presented was "whether the trial court committed harmful error by submitting a broad-form question on damages that included an element without any evidentiary support." *Id.* at 231. The jury charge in question submitted two broad-form damage questions as to two separate plaintiffs. *Id.* The jury was then instructed to consider several elements of damages in answering the questions. *Id.* at 231–32. On appeal, the court of appeals agreed that the trial court erred in including a certain element of damages that was unsupported by the evidence in each instruction, but "concluded that the error was harmless because there was ample evidence on properly submitted elements of damage to support the jury's awards to both plaintiffs." *Id.* at 232. In reaching its decision, the court of appeals relied on the Texas Supreme Court's decision in *Thomas v. Oldham*, 895 S.W.2d 352 (Tex.1995), and distinguished the holding in *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000). The Texas Supreme Court reversed, concluding that the *Harris County* case was closer to *Casteel* than to *Thomas*. The primary focus of the Texas Supreme Court's analysis in distinguishing its decisions in *Thomas* and *Casteel* was preservation of error.

In *Thomas*, the defendant did not object to the submission of a broad-form damage question in which the jury was instructed to consider five separate damage elements. *See Harris County*, 96 S.W.3d at 232. On appeal, the defendant attempted to rely on notations made by the jury in the margin next to the five elements of damage to attack the sufficiency of the evidence to

support the amounts noted. *Thomas*, 895 S.W.2d at 359. The Texas Supreme Court held that the jury margin notations were not separate damage awards for purposes of evidentiary review. *Id.* at 359. The court further held that because the defendant did not ask for separate damage findings, it could only challenge the "sufficiency of the evidence supporting the whole verdict." *Id.* at 360; *see also Harris County*, 96 S.W.3d at 232.

In *Casteel*, however, the defendant timely objected to the submission of a broad-form liability question instructing the jury on thirteen separate liability theories. 22 S.W.3d at 387. The basis of the defendant's objection was that the plaintiff did not have standing to pursue any DTPA liability theory based on article 21.21 of the Texas Insurance Code. *Id.* The Texas Supreme Court determined that the broad-form question was erroneous because it commingled valid and invalid liability theories. *Id.* at 388. The court then held that the error was harmful because it could not be determined whether the improperly submitted theories formed the sole basis of the jury's finding. *Id.* at 389.

After distinguishing between its decisions in *Thomas* and *Casteel*, the Texas Supreme Court noted in the *Harris County* case that Harris County did object to the charge. 96 S.W.3d at 232. The court observed:

Harris County pointed out to the trial court that particular elements of damage had no support in the evidence and should not be included in the broad-form question. The objection was timely and specific. It was also correct, and the trial court clearly erred when it did not sustain the objection and correct the charge.

*Id.* The court concluded:

A litigant should not be powerless to require the trial court to fulfill its duty

of submitting only those questions and instructions having support in the pleadings and evidence. A timely objection, plainly informing the court that a specific element of damages should not be included in a broad-form question because there is no evidence to support its submission, therefore preserves error for appellate review. We hold that *Casteel's* reasoning applies equally to broad-form damage questions, and under its rationale we conclude that the charge error in this case was harmful.

*Id.* at 236 (citations omitted).

The question presented in this case is how does the holding in *Harris County* apply in the context of a bench trial? If a defendant believes a specific element of damages presented for the trial court's consideration is not supported by sufficient evidence, how does the defendant preserve error with regard to the court's consideration of that element? How does the defendant preserve its ability to challenge the sufficiency of the evidence to support specific damage findings rather than being limited to a *Thomas* challenge to the sufficiency of the evidence supporting the whole verdict?

■■■■ Tagle and Triple R contend they preserved error by filing a request for additional or amended findings of fact. We agree that a properly prepared request for findings or additional findings specifically drawing a trial court's attention to the *Harris County/Casteel* problem will likely be sufficient to preserve error.[1] In this case, however, Tagle and Triple R only requested additional findings that: (1) appellee sustained lost wages in the amount of $14,297.00; and (2) appellee incurred reasonable and necessary past medical expenses in the amount of $56,232.96.[2] The requested additional findings did not specifically draw the trial court's attention to any complaint that one of the elements of damages included in its broad-form finding was unsupported by the evidence. Accordingly, Tagle and Triple R waived any complaint regarding the sufficiency of the evidence to support separate damage findings and are limited to a *Thomas* challenge to the sufficiency of the evidence supporting the $2,000,000 damage award as a whole.

## TESTIMONY OF DR. MARIO JIMINEZ

■■■■ In their second issue, Tagle and Triple R contend that the trial court erred in admitting the testimony of Dr. Mario Jiminez because he was not properly des-

---

1. Tagle and Triple R also refer to proposed findings filed before trial; however, these proposed findings would not alert a trial court to an issue regarding the sufficiency of the evidence to support a specific damage finding when the evidence had yet to be introduced.

2. We note that the first requested additional finding conflicts with the trial court's original finding because the trial court's original finding found no lost wages, while the requested additional finding would find $14,297.00 in lost wages. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 763 (Tex.2003) (listing lost wages and lost earning capacity as separate damage elements); *Koko Motel, Inc. v. Mayo,* 91 S.W.3d 41, 51 (Tex.App.-Amarillo 2002, pet. denied) (distinguishing lost wages from lost earning capacity). A trial court is not required to make additional findings which conflict with the original findings. *Vickery v. Comm'n for Lawyer Discipline,* 5 S.W.3d 241, 254 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). We further note that the trial court would not have erred in refusing to find the specific amount of damages requested by Tagle and Triple R because a trial court is permitted to respond to a request for additional findings by finding whatever amount of damages the trial court deems the record to justify. *See Wagner v. Riske,* 142 Tex. 337, 178 S.W.2d 117, 120 (1944); *Gorbett Bros. Steel Co. v. Anderson, Clayton & Co.,* 533 S.W.2d 413, 419 (Tex.Civ. App.-Houston [1st Dist.] 1976, no writ).

ignated or qualified to testify with regard to future medical expenses. We do not decide whether the trial court abused its discretion in admitting the testimony because even if the trial court erred, the error was harmless for several reasons.

■ First, the trial was to the bench, and the trial judge repeatedly stated that although he was admitting the testimony, he would later determine the weight it should be given. Dr. Jiminez testified that Galvan's future medical expenses would be $200,000 to $300,000 a year for the first four or five years and then $100,000 to $150,000 beginning in years four of five for the rest of his life. Given the amount of damages awarded, it would not appear that the trial court gave Dr. Jiminez's testimony significant weight. In addition, assuming Tagle and Triple R are correct that Dr. Jiminez's testimony was not competent evidence, an appellate court generally assumes that the trial court disregarded any incompetent evidence in a case tried to the court. *Gillespie v. Gillespie,* 644 S.W.2d 449, 450 (Tex.1982); *Great Global Assur. Co. v. Keltex Properties, Inc.,* 904 S.W.2d 771, 777–778 (Tex.App.-Corpus Christi 1995, no writ). Furthermore, Texas follows the "reasonable probability" rule for future damage for personal injuries. *See City of San Antonio v. Vela,* 762 S.W.2d 314, 320 (Tex.App.-San Antonio 1988, writ denied). As a result, an award of future medical expenses is a matter primarily for the trier of fact to determine, and no precise evidence is required. *Id.* The trier of fact may base its award on the nature of the injuries, the medical care rendered before trial, and the condition of the injured party at the time of trial. *Id.* In order to "sustain a finding on future medical expenses, the plaintiff is not required to establish the future medical consequences of his injury by expert medical testimony grounded on 'reasonable medical

probability.' " *Id.* Accordingly, the trial court could have awarded damages for future medical expenses independent of Dr. Jiminez's testimony, and because error was not preserved with regard to the separate damage elements, we are not required to consider the sufficiency of the evidence to support future medical expenses as a separate damage element. Finally, Texas courts have concluded that the potentially prejudicial influence on juries of an "expert," whose testimony fails to satisfy *Robinson* reliability standards, is significantly less of a concern when the trial judge is the factfinder. *See National Western Life Ins. Co. v. Rowe,* 86 S.W.3d 285, 302–303 (Tex.App.-Austin 2002, pet. filed); *Olin Corp. v. Smith,* 990 S.W.2d 789, 796 n. 1 (Tex.App.-Austin 1999, pet. denied). For these reasons, we hold that any error in admitting Dr. Jiminez's testimony was harmless.

### SUFFICIENCY OF THE EVIDENCE AND Remittitur

■ The trial judge entered findings of fact and conclusions of law. The trial court's findings of fact carry the same force and dignity as a jury's verdict. *M.D. Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991); *McLaughlin, Inc. v. Northstar Drilling Technologies, Inc.,* 138 S.W.3d 24, 27 (Tex.App.-San Antonio 2004, no pet.). We review the trial court's fact findings the same way we review the legal and factual sufficiency of the evidence supporting a jury's verdict. *M.D. Anderson,* 806 S.W.2d at 794, *McLaughlin, Inc.,* 138 S.W.3d at 27.

In analyzing the legal sufficiency of the evidence supporting a finding of fact, we examine the record for evidence and inferences that support the challenged finding, while disregarding all contrary evidence and inferences. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994), *McLaughlin,*

*Inc.*, 138 S.W.3d at 27. If there is more than a scintilla of evidence to support the findings, the legal sufficiency challenge cannot be sustained. *Catalina*, 881 S.W.2d at 297; *McLaughlin, Inc.*, 138 S.W.3d at 27.

When analyzing the factual sufficiency of the evidence, we consider all of the evidence in the record both for and against the finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *McLaughlin, Inc.*, 138 S.W.3d at 27. We will find the evidence factually insufficient if we conclude the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain*, 709 S.W.2d at 176; *McLaughlin, Inc.*, 138 S.W.3d at 27. As the trier of fact in a bench trial, the trial judge determines the credibility of the witnesses and the weight to be given their testimony, decides whether to believe or disbelieve all or any part of the testimony, and resolves any inconsistencies in the testimony. *Lifshutz v. Lifshutz*, 61 S.W.3d 511, 515 (Tex.App.-San Antonio 2001, pet. denied). When there is conflicting evidence, the appellate court usually regards the finding of the trier of fact as conclusive. *Id.*

In their third issue, Tagle and Triple R challenge the legal and factual sufficiency of the evidence to support the award of $2,000,000.00 in damages. Although Tagle and Triple R frame their fourth issue as challenging the trial court's failure to suggest a remittitur, Tagle and Triple R request that this court suggest a remittitur to $500,000 in lieu of a remand if we determine the evidence is factually insufficient.

The trial court entered the following finding regarding the damage award:

> That Two Million Dollars ($2,000,000.00) is the sum of money that reasonably and fairly compensates Ricardo Galvan for his injuries that were proximately caused by the incident made the basis of this suit, and that such compensation is awarded upon the Court's consideration of Ricardo Galvan's physical pain and suffering (past and future), mental anguish (past and future), loss of physical capacity (past and future), reasonable and necessary medical expenses incurred (past and future), and loss of wage earning capacity (past and future).

Because Tagle and Triple R are limited to challenging the sufficiency of the evidence to support the damage award as a whole, we need not decide if the evidence is sufficient to support each damage element. Therefore, although we will separately set forth the standard regarding each damage element, we discuss the evidence separately as a whole.

### A. Legal Standards for Separate Damage Awards

#### 1. Physical Pain and Suffering (Past and Future)

In assessing personal injury damages, the jury has wide latitude in determining the amount of the award. *Southwest Texas Coors, Inc. v. Morales*, 948 S.W.2d 948, 951 (Tex.App.-San Antonio 1997, no pet.). The process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *Dawson v. Briggs*, 107 S.W.3d 739, 750 (Tex.App.-Fort Worth 2003, no pet.). The element of pain and suffering is not subject to precise mathematical calculations or objective analysis and is particularly within the province of the jury to resolve and to determine appropriate amounts. *Dawson*, 107 S.W.3d at 750–51; *Morales*, 948 S.W.2d at 951–52.

#### 2. Mental Anguish (Past and Future)

To support an award of mental anguish, a party must present either direct evidence of the nature, duration, and severity of her mental anguish, thereby establishing a substantial interruption in her daily routine, or circumstantial evidence of a high degree of mental pain and distress that is greater in degree than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995); *Minnesota Life Ins. Co. v. Vasquez*, 133 S.W.3d 320, 324 (Tex.App.-Corpus Christi 2004, pet. filed). The process of awarding damages for amorphous, discretionary injuries such as mental anguish is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss. *Dawson*, 107 S.W.3d at 750. Mental anguish can be established through testimony from the injured party explaining how she felt and how her life was disrupted. *Minnesota Life Ins. Co. v. Vasquez*, 133 S.W.3d at 324.

### 3. Loss of Physical Capacity (Past and Future)

The effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages, or diminished earning capacity. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d at 772; *Patlyek v. Brittain*, 149 S.W.3d 781, 785 (Tex.App.-Austin 2004, pet. filed). To recover damages for physical impairment, the plaintiff must show: (1) he incurred injuries that are distinct from, or extend beyond, injuries compensable as pain and suffering, loss of earning capacity, or other damage elements; and (2) these distinct injuries have had a "substantial" effect. *Patlyek v. Brittain*, 149 S.W.3d at 785.

### 4. Reasonable and Necessary Medical Expenses Incurred (Past and Future)

Texas follows the "reasonable probability" rule for future damage for personal injuries. *See City of San Antonio v. Vela*, 762 S.W.2d 314, 320 (Tex.App.-San Antonio 1988, writ denied). As a result, an award of future medical expenses is a matter primarily for the trier of fact to determine, and no precise evidence is required. *Id.* The trier of fact may base its award on the nature of the injuries, the medical care rendered before trial, and the condition of the injured party at the time of trial. *Id.* In order to "sustain a finding on future medical expenses, the plaintiff is not required to establish the future medical consequences of his injury by expert medical testimony grounded on 'reasonable medical probability.'" *Id.*

### 5. Loss of Wage Earning Capacity (Past and Future)

Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after the trial. *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex.App.-Tyler 2003, no pet.); *Dawson*, 107 S.W.3d at 750. Because the amount of money a plaintiff might earn in the future is always uncertain, the jury has considerable discretion in determining the amount. *Plainview Motels, Inc.*, 127 S.W.3d at 35; *Dawson*, 107 S.W.3d at 750. To support an award of damages for loss of future earning capacity, the plaintiff must introduce evidence sufficient to allow the jury to reasonably measure earning capacity in monetary terms. *Plainview Motels, Inc.*, 127 S.W.3d at 35–36. To support an award of damages for loss of future earning capacity, the plaintiff can introduce evidence of past earnings; the plaintiff's stamina, efficiency, and ability to work with pain; the weaknesses and degenerative changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy. *Plainview Motels, Inc.*, 127 S.W.3d at 36; *Dawson*, 107

S.W.3d at 750. There must be some evidence that the plaintiff had the capacity to work prior to the injury, and that his capacity was impaired as a result of the injury. *Plainview Motels, Inc.*, 127 S.W.3d at 36.

## B. Sufficiency of the Evidence

The medical records from Dr. Patino contain numerous references to Galvan's subjective reporting of severe pain. Although at times Galvan reported the severity of his pain had improved, in other instances, he reported no change or slight worsening. The medical records contain objective assessments based on Dr. Patino's examinations regarding tenderness and discomfort. Dr. Patino reported on various occasions that Galvan experienced pain during the palpation of Galvan's lumbar region. Dr. Tijmes reports also contain references to Galvan's reported pain. Finally, the medical records reference the various prescriptions Galvan was given to alleviate his pain.

Dr. Tijmes testified that when he first examined Galvan, Galvan complained of pain to the neck radiating to the right shoulder, right arm, and some numbing sensation to the right hand. Galvan also had increased pain to the low back and to the right foot and right leg. Dr. Tijmes testified that Galvan will permanently have residual pain.

Galvan testified that after the accident, he was hurting all over. He reported that he was in intense pain. After the operation, Galvan stated that he continued to have pain and that he hurts when he bends down. Galvan stated that the pain prevents him from sleeping.

Galvan testified that he was depressed because he was no longer able to help his family and support them like he could before the accident. He testified that he felt like he was dragging his family backward. Galvan stated that he was taking antidepressants and wished that he had the resources to get more psychological help through therapists. Dr. Jiminez testified that the psychological component for a 26 year old to have chronic pain "is probably the most difficult part." Dr. Jiminez explained, "because one at that point has to change their entire way of how things are done and learn how to cope with that, uh, limitation, with that disability." Dr. Jiminez stated that he had prescribed the antidepressant Zoloft for Galvan and believed that Galvan would require additional prescriptions of antidepressants in the future and that at some point Galvan would need intense psychological therapy.

Evidence was presented regarding the on-going restrictions imposed on Galvan's activities, including bending and lifting. Dr. Tijmes testified that Galvan will continue to have decreased mobility and ability. Dr. Tijmes testified that Galvan will be impaired in the amount of weight he can lift.

Evidence was presented regarding the nature of Galvan's injuries and his medical care. The bills for the medical expenses Galvan incurred were introduced into evidence. Galvan also testified that he continued to have pain after his operation.

Dr. Tijmes testified regarding the need for the surgical procedure and that the costs were reasonable and necessary. Although Dr. Dozier and Dr. Nowlin, the experts presented by Tagle and Triple R, disagreed with Dr. Tijmes's diagnosis, Dr. Legendre agreed that a disc herniation was present. In addition, Dr. Tijmes testified that during the surgical procedure, he visually saw that the disc was ruptured between the L4 and L5 spinal region. Dr. Tijmes also testified that the fusion that was performed would likely cause instabili-

ty between the L3 and L4 spinal region and between the L5 and S1 spinal region.

Galvan's paystubs immediately prior to the accident were introduced into evidence. The economist for Galvan provided a table that would enable the trial court to calculate the present value of Galvan's loss of wage earning capacity if the trial court determined that Galvan had such a loss; however, Galvan's economist did not testify that Galvan had diminished earning capacity. Although Dr. Tijmes agreed that Galvan could perform certain jobs, Dr. Tijmes stated that Galvan was not likely employable given that he would be required to disclose the restrictions on his ability to perform work and the competition in the workforce against unimpaired workers.

Tagle and Triple R presented the testimony of a vocational rehabilitation counselor, Shelly Eike, who testified regarding the categories of jobs Galvan could perform and the number of vacancies in those categories. Tagle and Triple R also presented the testimony of an economist, Helen Reynolds, who testified that Galvan's past loss of wage earning capacity was approximately $8,000 between the date of the accident and the date he was released for light duty in September of 2000, and an additional $5,500 from the date of the surgery until Galvan was released for light duty in April of 2001. Reynolds also testified that if it were determined that Galvan would be unable to obtain employment from the first date he was released from light duty in September of 2000 until the date of his surgery in December of 2000, the past loss of wage earning capacity would be approximately $4,500. Reynolds testified that Galvan did not have any loss of future earning capacity.

Having reviewed all of the evidence, we hold that the evidence is legally and factually sufficient to support the damage award as a whole.

## PREJUDGMENT INTEREST

■ In their last issue, Tagle and Triple R contend that the trial court erred in calculating the prejudgment interest. Specifically, they contend that prejudgment interest should not have accrued from the date the mistrial was declared in the first trial through the conclusion of the bench trial because Galvan was responsible for the mistrial. Tagle and Triple R also contend that prejudgment interest should not have accrued from the date of the bench trial through the date the trial court signed the judgment because they were not responsible for the trial court's delay. Galvan responds that prejudgment interest properly accrued because he was not responsible for the mistrial or the trial court's delay.

■ The award of prejudgment interest during periods of delay is left to the discretion of the trial court. *Helena Chem. Co. v. Wilkins*, 18 S.W.3d 744, 760 (Tex.App.-San Antonio 2000), *aff'd*, 47 S.W.3d 486 (Tex.2001). The trial court is authorized to deny prejudgment interest based on periods of delay caused by a claimant; however, the trial court is not authorized to deny prejudgment interest based on delay attributed to the court's crowded docket. *Purcell Const., Inc. v. Welch*, 17 S.W.3d 398, 403 (Tex.App.-Houston [1st Dist.] 2000, no pet.). Even if a claimant causes a period of delay, the trial court is not required to deny prejudgment interest because the decision is entirely within the trial court's discretion. *Wilkins*, 18 S.W.3d at 760; *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 243 (Tex.App.-San Antonio 2001, pet. denied).

■ In this case, the record does not show that the period of delay between the date of the bench trial through the date

the trial court signed the judgment was caused by the claimant. Just as the trial court is not authorized to deny prejudgment interest based on delay attributed to the court's crowded docket, the trial court should not be authorized to deny prejudgment interest based on a delay by the trial court in signing a judgment. *See Welch,* 17 S.W.3d at 403.

With regard to the mistrial, having reviewed the reporter's record from the first trial, it appears that the attorneys engaged in a series of disagreements over various legal issues shortly after beginning the trial. The attorneys engaged in a prolonged discussion with the trial court at the bench off-the-record regarding the introduction of the report of the DPS trooper who investigated the accident. When Tagle was called as a witness, the attorneys disagreed regarding whether prior pleadings and interrogatory answers were admissible to impeach his testimony that he always accepted responsibility for the accident. Galvan's attorneys contended that Galvan was entitled to show the jury that Tagle initially denied liability, but Tagle's attorney contended that amended pleadings and amended interrogatory answers were not admissible. From the record, it appears that opening arguments, the limited questioning, and the extensive discussions had taken two hours. After an extended discussion outside the jury's presence, Galvan's attorney asked if he could "continue on his answers to interrogatories", and the trial judge stated, "You may. Whatever." When Galvan's attorney proceeded to question Tagle regarding the inconsistency between his admission of liability in court and his denial of responsibility in his initial interrogatory responses, Tagle's attorney objected, stating that the court had previously sustained his objection to that line of questioning. Galvan's attorney responded, "I thought we were talking about the pleadings then. That's

why I asked permission to go forward on the interrogatory." After this exchange, the trial court declared a mistrial, stating:

> THE COURT: People, I have to do what I have to do. And, uh, members of the, uh—you may be seated, uh, Mr. Allison. We're, uh, running into a problem members of the Jury. And, uh, sometimes some of these problems cannot be resolved, because of the fact that, uh, you may have been exposed to information or you may have heard from sitting in the Jury room, discussions that have taken place here inside the courtroom, since the Jury room is so close to the, uh, courtroom itself. I have given, uh, the matter considerable thought and under the circumstances, I am going to have [to] grant the Defendant's Motion for a Mistrial....

The trial judge, who was present at the time and had a better understanding of his reasons for granting the mistrial, may have believed the mistrial was necessary based on the manner in which the issues were pursued by both attorneys, not just Galvan's attorney. Furthermore, even if the trial judge believed that the actions by Galvan's attorney were the cause of the mistrial, the trial judge may not have believed that the delay between the mistrial and the bench trial was caused by Galvan but was caused by docketing concerns. Accordingly, the record does not support a finding that the trial court abused its discretion in accruing prejudgment interest from the date the lawsuit was filed through the date of the final judgment.

### CONCLUSION

The trial court's judgment is affirmed.

SARAH B. DUNCAN, Justice, concurred in the judgment.

Concurring opinion by PHYLIS J. SPEEDLIN, Justice.

PHYLIS J. SPEEDLIN, Justice, concurring.

I concur in the judgment only, because I agree with the majority's conclusion that Tagle and Triple R did not make the trial court aware in a timely and plain manner that they were requesting separate damage awards for purposes of evidentiary review. *See Harris County v. Smith,* 96 S.W.3d 230, 236 (Tex.2002). Since we do not know what amount the trial court awarded for any of the ten damage elements included in the two million dollar award, a meaningful review of the sufficiency of the evidence is extremely difficult. *Greater Houston Transp. Co., Inc. v. Zrubeck,* 850 S.W.2d 579, 589 (Tex.App.-Corpus Christi 1993, writ denied). In light of this record and the evidence presented, I agree with the majority's conclusion that the evidence is legally and factually sufficient to support the damage award.

I write separately because of the majority's heavy reliance on *City of San Antonio v. Vela,* 762 S.W.2d 314 (Tex.App.-San Antonio 1988, writ denied). As Chief Justice Cadena cautioned in his dissent in *Vela,* no Texas court has ever upheld an award of future medical expenses "where there is no evidence whatsoever concerning the need for future medical attention nor the reasonable cost of such attention." *Id.* at 323 (Cadena, C.J., dissenting). Texas instead follows the "reasonable probability rule," which in this context simply means that evidence must be presented that damages would "reasonably and probably result from the injury sustained." *Fisher v. Coastal Transp. Co.,* 149 Tex. 224, 230 S.W.2d 522, 523 (Tex.1950). The injured party seeking recovery of future damages must: "(1) present evidence that, in reasonable probability, it will incur expenses in the future, and (2) prove the probable reasonable amount of the future expenses." *MCI Telecomm. Corp. v. Texas Util. Elec. Co.,* 995 S.W.2d 647, 654–655 (Tex.1999). Obviously, as Chief Justice Cadena wrote, "testimony regarding future medical expenses cannot be exact and absolute ... any more than any attempt to predict the future can be precise." *Vela,* 762 S.W.2d at 323 (Cadena, C.J., dissenting). This, however, does not obviate the need for some evidence. *Id.* If the parties had preserved error and properly presented the issue on appeal, I would be hard pressed to find sufficient evidence in this record to support damages for future medical expenses.